UNITED STATES DISTRICT COURT
FOR THE MAINE DISTRICT

| | |
|---|---|
| ) | Case: 21-cv-137-JDL |
| ) | |
| PRIMARY PRODUCTIONS LLC ) | **CLASS ACTION COMPLAINT** |
| ) | |
| on behalf of themself and all others similarly situated ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **SHERMAN ACT ANTITRUST** |
| ) | **AMENDED COMPLAINT FOR** |
| APPLE INC; ) | **DAMAGES AND INJUNCTION** |
| Defendant. ) | |
| ) | |
| ) | |
| ) | DEMAND FOR JURY TRIAL |
| ) | |

<u>**PLAINTIFF'S AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**</u>

## I.    INTRODUCTION

1. This class action seeks to redress injustices Apple imparts upon the developer base that the monopoly necessarily relies upon to exist. Documented herein are the anti-competitive business practices that have become the norm at Apple, and how they have harmed Plaintiff, an educational media producer, and countless other class members that shall be identified in discovery. This is a lawsuit representing the millions of independent entrepreneurs that serve as the fabric connecting our modern economy. Counsel, a Maine-native, is passionately devoted to protecting the rights of these creative minds from the stifling and oppressive greed of Apple. Plaintiff and the proposed class members are largely small startups who break their back on Apple's terms to produce free apps consumed by billions.

2. Two decades ago, the United States Department of Justice expended considerable resources to prosecute the Microsoft Corporation for alleged anti-competitive activity that amounted to bundling the Explorer web browser too prominently to the Windows operating system. Notably, Microsoft did not restrict each and every software developer from directly selling software to PC consumers. Microsoft did not require programmers to submit their applications for approval, in order to distribute software in a brick-and-mortar store. Microsoft did not reject 40,000 software applications per week, wasting millions of person-hours of labor. Microsoft did not demand an economically inefficient 33% tax on all PC software. And Microsoft did not charge $99/year to every aspiring computer programmer, many of whom are students or entrepreneurs with no income or benefits, simply to access the Windows SDK. There seems to be little question that had Microsoft committed the

above antitrust violations, public outrage would have ensued, the company would have been broken up, and likely, faced criminal charges.

3. Apple, by breathtaking comparison, has secured its position as the wealthiest company in the world by committing all of those enumerated crimes under the guise of popularity and commitment to quality. There can be little doubt that Tim Cook sought to compensate for the tragic loss of Steve Jobs – and the innovation he exuded – by seeking reckless profits on the heels of the success that Apple enjoyed with the iPhone. This stealth transition occurred relatively quickly, over the last ten years.

4. Most consumers associate Apple with their past days of creative good, and hence, the company now operates as a stealth monopolist. To be sure, many consumers eagerly await opening or "unboxing" their new iPhone, not fully aware that this bundle of hardware and software would be even better if Apple ceased their greedy practices. Nonetheless, concerns over Big Tech are increasingly garnering public attention. As other courts have remarked, scant is the evidence that Apple cares about its developers – survers, R&D funds, focus groups, transparent development assistance programs, etc, don't seem to exist at the magnitude one would expect. A reactionary "developer center" at Apple Campus is too little, too late. As this Amended Complaint makes clear, Apple treats developers like second class citizens.

5. In consideration, this Amended Complaint draws on the Sherman claim theory presented in *Epic* and *Cameron*. Notably, this Amended Complaint also elucidates a monopsony theory that Plaintiff believes is the most far-reaching, and importantly, simplest claim theory to protect independent developers. To date, no claim theory against Apple has sufficiently protected free apps – which represent a large proportion of the iPhone software

bundle ecosystem. By expanding the claim theory to include free apps, our monopsony-based theory of hardware & software bundling presents straightforward definitions of product interchangeability, lost cost & quality competition, and other Sherman elements.

6.   The largest component of this class action is that of free apps that were denied distribution, or effectively denied through ranking suppression.

7.   This class action charges Apple with six Sherman Act causes of action applied to three proposed classes. It anticipates MDL[1] status for a class action representing and protecting the interests of small developers. It does so by creating a proposed class for developers of free apps, and a proposed class for developers who paid a $99 annual tax – the subject of a recent, groundbreaking Congressional Subcommittee report. No other class action currently protects these two classes – which counsel here does by asserting that Apple is a monopsony retail buyer of Apps, and hence underpays developers, even those of free apps, when it disallows them or suppresses their ranking on the App Store to favor Apple's own apps or its cronies. Alternatively, we assert that Apple holds a monopoly in the market for smartphone enhanced internet backbone access devices, and therefore improperly excludes developers of free apps from publication.

8.   As the US House of Representatives Subcommittee on Antitrust recently exposed, Apple, when it suited them with Chinese developer Baidu, appointed two Apple employees to help them navigate the murky waters of the Apple App Store. The Plaintiff and class members in this case, however, weren't so lucky to obtain such hand-holding – their thousands of

---

[1] On April 26, 2021, counsel filed Sherman class action claims under FRCP 15(a)(1) for a client in the New Hampshire District.  This Plaintiff, with ties to Maine and expiring statutes of limitations, proceeded in this District  as a necessity to protect its right to pursue legal redress. Subsequently, the similar claims have been re-filed in Northern California, under direction from the New Hampshire Court. Counsel recognizes this Amended Complaint may be subject to MDL designation, transfer to CAND,  and/or maintaining distinct cases, as determined by this Court.

person-hours of work were tossed away by Apple, with illegal rejections that, according to the same House report, even astonished many Apple employees.

9.   The same report issued concerns over a $3 billion annual tax on developers levied by Apple. Assuming a ten-year average developer contract, this lawsuit seeks to refund an illicit $30 billion tax to small developers. In addition, it is estimated at least two thousand apps, amongst the millions which applied, were denied because they competed with Apple's own rival apps, or the monopoly's close cronies. Hence, class damages could total over $230 billion, when combining improper taxes, rival exclusion, and excessive rents on in-app payments – making this potentially the largest class action in history. Expedited discovery will allow further refinement of this estimate.

10.   This is a rapidly evolving legal matter. Apple has become the richest corporate entity in the world, thriving from 30% commissions and deeply curated – and restricted – trade outputs in the App Store that launched over a decade ago. Apple wants the public to believe it is all in the name of safety and consumer privacy. Last month, the New York Times asked Apple CEO Mr. Tim Cook about the mounting concerns over Apple's unyielding power and absolute control over the App Store. His response – "somebody has to" control the internet, it might as well be Apple – certainly sounds more like the divine right of kings than a new age technology company.

11.   Mr. Cook's logic has one fatal flaw. For over forty years, and still today, the Apple Mac ecosystem healthfully thrived without such policing. Mac users simply aren't begging Apple to police their computer software due to an imaginary flood of privacy violations and other scaremongering tactics.

12. Representing a class of developers who directly suffer from Apple's ever-expanding power grab is Primary Productions LLC, a creative studio with diverse work products. Counsel in the class action endeavors to represent the best interests of, and provide a voice to, other developers that have thus far been silenced by a company that took a very wrong turn – at a steep cost to society – after the passing of its legendary founder Steve Jobs.

13. In June 2018, the Plaintiff completed an iOS application ("the app") that was seven years in the making. The app sought to give away blockchain currency (i.e. Ethereum, Bitcoin, etc) to users through an entertaining and educational learning process where users would learn the basics of creating digital wallets, making deposits and tracking their wallet asset prices. The app was completely free to use, funded through sponsorships and media partnerships, and did not subject any user to any form of risk, whatsoever.  In fact, users were paid to use the app, in the form of modern digital currency.

14. Apple, meanwhile, was developing the Apple Arcade, targeting low-price and free to play games and entertainment software. Primary Productions' app, as Apple recognized, was a sure hit in the growing enthusiasm for blockchain encryption currency that flourished in mid-2018. As such, Apple's growing tentacles into low price gaming was directly threatened by Primary Productions' very existence. Apple killed the Primary Productions app before the public ever had a chance to enjoy it, using the typical pretextual reasons they harass tens of thousands of developers with. In 2021 alone, as of filing, Apple has already rejected one million apps, representing millions of person-hours of lost work, all to appease the Apple giant.

15. This case centers on a form of censorship imposed by Apple, the extent of which is largely unknown to the public, but evident to nearly every small developer who lives under Apple's

oppression. Until about a decade ago, computer developers wrote software applications and published their work to the public domain, or sold it in brick-and-mortar software shops. Apple changed the game by introducing the App Store, and a decade later, serious questions exist for our society. Should every inventor – from creative labs like Plaintiff, to Nobel laureate level inventors denied app publication – have to gain Apple's approval, or were the longstanding methods and freedoms enjoyed before the App Store better for society? This is a critical antitrust matter that is ripe for judicial scrutiny. Until the App Store was invented in 2008, and for the entire history of computing, software authors effectively served as independent inventors and intellectual property developers when they published their works in the public domain or sold them in software shops. Over time, Apple's App Store has so far distanced the independent developer-inventor from direct access to his or her audience, that critical commerce is restrained, in violation of the Sherman Act.

16. Nearly 60% of users and 80% of paid internet commerce access the national internet backbone using Apple devices. For many millions of these users, their *de facto* access to the internet relies upon using an iOS device. Consider, for example, children or elderly who have been taught to access the internet using a relative's Apple device and have absolutely no reasonable alternative. As such, Apple operates a *de facto* monopoly for access to the national internet communication backbone. More precisely, this lawsuit uses the novel market definition "smartphone enhanced national internet commerce and information communicating devices." Essentially, we argue that citizens make a substantial investment (around $1000) in an amalgamation of hardware (camera, GPS, gyroscopes, heart sensors, microphone, altimeter, etc) to communicate with other citizens, and Apple

illegally restricts this *de facto* public utility investment. In short, citizens own their network, and Apple has no right to police it, as was the case for decades with software shops and free markets uninhibited by Big Tech.

17. Alternatively, we incorporate and improve upon the "Kodak downstream" antitrust app market theory, proceeding in numerous other districts for paid apps, so as to avoid frivolous dilatory motions by Defendant Apple – which scored a nine year delay win in *Pepper*, until a milestone SCOTUS mandate.

18. Apple has restricted trade, communication, and free information exchange, all in violation of the Sherman Act, when it disallowed Plaintiff's reasonable application.

CLAIM THEORY OVERVIEW

19. Plaintiffs and their counsel have worked tirelessly to analyze the various claim theories currently under litigation against Apple and have structured the "smartphone enhanced internet commerce and information access device" abstraction. Using the definitions identified in the following diagram, it becomes evident how the Sherman marketplace definitions apply to the iPhone ecosystem:

20.



## Smartphone Enhanced Internet Information and Commerce Device Marketplace

| Interchangeable Devices |
|---|
| Apple iPhone Ecosystem (Represents 80% of US smartphone commerce) |
| Microsoft Phone (obsolete) Blackberry (obsolete) Android (20% US Market) |

Amalgamation of Hardware

(Camera, GPS, etc)

*Consumers purchase hardware and software bundle from Apple*

Bundle of Software Apps

(Free, Paid, Apple Brand)

*A smartphone is an ecosystem of hardware AND software*

## Monopsony Theory for iPhone

The iPhone exists within the marketplace for smartphones.
•Apple bundles its *own apps* with the iPhone, e.g. FaceTime.
•Apple bundles *free apps* with the iPhone,
usually purchased at a price of $0 from developer.
Developer rewarded with advertising stream revenue.
•Apple bundles (at IAP price) 3rd Party *paid apps*, e.g. MS Word.
Apple conveys 66.6% commission to 3rd Party.

## Anti-Competitive App Distribution (Sherman Violation)

•Apple buys some free apps at substantial prices(e.g. weather prediction).
•Apple disallows  or ranking suppresses competitor apps.
•Apple assists some developers (e.g. Chinese Government),
blacklists others (Class Action Plaintiffs)
•Apple retains 33% off all paid app IAPs.
•Developer and consumer are at a full disconnect-
only way to get an iPhone app is "bundled" with the iPhone,
i.e. approved by Apple.
*A disallowed or suppressed app is underpaid by the Apple monopsony*

21. In this schematic, free apps are represented just like their paid counterparts. The marketplace here is the smartphone internet access device, and reasonable interchangeability is easily achieved by noting the existence of Windows Phone, Blackberry, and Android. Apple controls nearly 80% of the commerce transactions that occur over this device group. In this model, Apple sells to the consumer a bundle of hardware and software. The consumer is unaware of the existence of developers, if they aren't approved and promoted by Apple. The merchant of record for all iPhone app purchases is indeed Apple. Counsels' review of other pending antitrust claims nationally neglect to formulate Sherman definitions that equally apply to free apps – a major component of the ecosystem and a significant source of lost "person-years" of work.

22. After applying these definitions, we then proceed to specification of the institutional App marketplace:

## **Smartphone Enhanced Internet Application**
## **OEM Software Marketplace (App Distribution Rights)**

    

*Distributors buy apps, like film studios buy movie rights.*



*Severely constrained marketplace*

*Low stated volume*
*High theoretical volume*



| Largely Theoretical Marketplace |
| --- |
| Venture Capitalists & Private Equity firms routinely purchase apps at the OEM/institutional/wholesale level. Their only effective "exit" is placement on the Apple App Store or Google Play Store. |
| Apple does not recognize this as a legitimate market in their DPLA agreement. Nonetheless, Apple monopsony "buys" millions of apps at a price of zero. Apple does occasionally acknowledge institutional purchase of apps. |

| Interchangeable Applications |
| --- |
| Apple iPhone Applications amount to 80% of USA smartphone software sales. |
| Microsoft Phone (obsolete) Blackberry (obsolete) Android versions may exist (20% US Market) |

## **Anticompetitive App Marketplace Dominated by Apple**
•Apple buys most *free apps* at a price of $0 from developer.
Developer rewarded with advertising stream assignment.
•Apple buys 3rd Party *paid apps*, e.g. MS Word.
Price paid equals volume *  66.6% * IAP price
•Apple occasionally purchases free apps for
own-brand portfolio. Dark Sky weather app bought
for undisclosed sum, removed from Android.
•Apple frequently copies apps (i.e. Flashlight) eliminating rivals.
•Preferred partners (China Baidu, Stanford, etc) offered valuable chaperoning.
•Apple adds SDK functions permitting new classes
of apps , favoring own (Tile / AirTag).
•Cronyism by App Store employees obtains kick-backs from friends' apps.
Not officially sanctioned by Apple shareholders
•Rejects 40,000 apps a week; developers work
**millions of person-hours for no pay or benefits**.

*Competition would vastly increase app quality  & developer fairness*

23. Apple, of course, does not acknowledge this marketplace in their DPLA agreements. The company has spent a decade writing consumer and developer "agreements" which use wholly different terms, shield Apple of vast liability from third-party apps, while simultaneously collecting the bulk of profits. The DPLA and App Store employ language that a free app is "For Sale" or "Available" through the App Store, after gaining "approval" by Apple for "adherence to iOS standards." Herein lies the confusion, thus far, with other claim theories. In fact, developers do not sell apps. The only marketplace, the only seller of apps, is Apple itself. Understanding this key fact makes the rest of the antitrust theory flow logically. If Apple is the only seller of apps, just like they sell a proprietary bundle of hardware (GPS, camera, accelerometers, battery, screen, etc), then we understand that Apple is a monopsony buyer of apps. The vast majority of apps are purchased through coercion for a zero-dollar ($0) price from Apple. In other words, vast amounts of labor – millions of person years of developers – compete to sell their apps for free to Apple[2].

24. The reward is an assignment of advertising identifier code to the developer. This is a wholly separate marketplace from the purchase of the app, and thus far, has confounded legal theorists from correctly defining Apple's monopsony, with respect to free apps.

25. Apple might claim they never purchase apps, because their DPLA agreement doesn't use this terminology. Again, Plaintiffs assert the DPLA is a legally void, monopolistic contract, in large part because it uses false terms and definitions to purport the existence of an "independent, voluntary developer" base. The reality is, developers are told how to run

---

[2] The actual terms of an app sale from an independent developer to Apple are rather complex. Apple receives a license to distribute a particular version of an app's source code, in a bundle that is free to purchasers of the iOS ecosystem. It would appear patents, trademarks, advertising assignments and other intellectual property are retained by the developer. Expert opinions on the true nature of these transactions – which almost certainly differ from Apple's terms specified in the DPLA – will be forthcoming in discovery.

their business, and labor to sell their apps for free to Apple – hence increasing the value of the Apple ecosystem at their expense.

26. It should also be noted that Apple does purchase apps for non-zero prices, and routinely so. In the above diagram, it is noted the Dark Sky weather prediction app was purchased by Apple at an undisclosed price estimated between $100million and $1billion to bring the app to Apple's ecosystem, and exclude it from Android. Apple also finances the development of apps to assist other countries (Chinese government Baidu) and other "partners" it feel deserve direct reimbursement for helping improve the iPhone.

27. In short, our theory says Apple sells the "iPhone" as a bundle of software and hardware. This results in a disturbance to both the enhanced smartphone device marketplace, and equally, the institutional app distribution marketplace. Both of these markets will be referred to interchangeably throughout this Complaint. In these markets, Apple controls all the software, and there are no "independent" developer-vendors. By using crafty DPLA agreements and other political lobbying tactics, Apple has thus far pulled off what is the greatest business model in history – albeit an illegal one under Sherman.

## JURISDICTION AND VENUE

28. Venue in the Maine District is proper under 15 U.S.C. § 22, which states that any suit proceeding under antitrust laws against a corporation may be brought in any district where it transacts business. Apple transacts business in Maine and has a flagship Apple Store in Portland. Apple sells education and gaming products at said flagship store that directly compete with Plaintiff. Additionally, multiple officers of the Plaintiff corporation reside in Maine and did not personally waive venue via the Apple Developer Agreement. It is also alleged that the venue waiver is a monopolistic contract that is forced upon any developer

who wishes to make applications that access the national internet backbone and is itself a violation of the Sherman Act.

29. This Court has subject matter jurisdiction, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. 1332 (d), because the proposed classes consist of 100 or more members, the amount in controversy, estimated at $230 billion, exceeds $5,000,000, and at least one member of the class of plaintiffs is a citizen of a state different from Defendant Apple, a California corporation. Jurisdiction in this Court for a permanent injunction arises under 28 U.S.C. § 1331, for federal questions presented pursuant to 15 U.S.C. § 26 (Clayton Antitrust Act). Diversity jurisdiction is invoked pursuant to 28 U.S.C. § 1332 because the parties reside in different districts and the amount in controversy, estimated at $230 billion, exceeds $75,000.

## II.   PARTIES

30. Plaintiff Primary Productions LLC is a New Jersey Limited Liability Corporation with officers based in Maine. Plaintiff is an edutainment media production company. Plaintiff never signed, and refuses to sign, any developer agreement, forum waiver or contract with Apple. Plaintiff asserts said illicit agreements are prohibited by Sherman law, overly prohibitive and infringe upon its rights. Apple's preferred contracts dictate how a company must handle IP assets, how it must communicate with the press, and effectively seek to tell any would-be developer how to run its own business. Primary Productions LLC was formed in 2010. It is the 100% owner of the blockchain app that was rejected when submitted to Apple. Primary Productions' blockchain app was excluded from the smartphone enhanced internet device market through willful, illegal, and monopolistic behavior conducted by Apple. Primary Productions app was underpriced by Apple, the

monopsonist retailer. Primary Productions also now represents, for litigation purposes, a telecommunications app that had been ranked in the top-ten free "Utilities category" on the App store for several years since its launch in 2015.  The App offers IAP for premium telecommunications information. The App was subject to severe ranking suppression, falling from top ten to a rank of two hundred, when the developer sought to enforce a patent claim[3] with Apple. Apple replaced the app with an inferior copycat app from Israel.  That app has paid the $99 annual developer program fee for nearly ten years.

31. Apple's fist-name basis "Liz" from the App Review team then informed the developer, falsely, that their app violated numerous privacy policies, even though Apple's preferred partners, and the Israeli app, used the same techniques, or more invasive techniques.

### III.   <u>FACTUAL HISTORY</u>

32. Introductory paragraphs preceding this paragraph are asserted herein and responsive pleading is hereby noticed as necessary.

33. Apple operates the App Store and has exclusive control over iOS applications and their ability to access that national internet backbone.

34. The national TCP/IP internet backbone was built, at least in part, using taxpayer dollars for ARPANET.

35. Apple has profited immensely from the existence of the national internet backbone.

36. Without the internet, and the taxpayer dollars that built it, Apple would not enjoy the $2 trillion valuation it has amassed.

---

[3] Apple's crony, billion dollar Whitepages corporation, spent millions of dollars to invalidate the small developer's patent under *Alice* in the Northern District. As it turns out, IBM owned a prior art patent (never mentioned by Whitepages) which appears to be still enforceable – thus indicating the vast advantage Big Tech has in litigating patents, antitrust, and other matters against small developers.

37. The Apple smartphone ecosystem is primarily a graphical user interface software (iOS) and hardware configuration, connecting users to the national internet backbone.

38. Apple initially developed the App Store to serve as a quality control gateway, ensuring apps functioned to a satisfactory standard and didn't contain software bugs or illegal content. Publicly available materials reveal that Steve Jobs never wanted to make money directly from app developers, like Plaintiff; rather, he sought to create a great platform that would draw people to Apple's goodwill and brand. In this sense, in the name of illicit profits, Mr. Cook has willfully defied the document intent of Mr. Jobs at the foundation of the App Store.

39. Over the years, Apple has taken a more authoritarian approach to the App Store and has rejected and/or disallowed significant numbers of third-party applications.

**Emerging Antitrust Proceedings**

40. Antitrust regulation of Big Tech is a rapidly emerging matter of global public interest.

41. The global population rapidly adopted smartphone internet connectivity over the past decade. This has led to vast implications which we are in the very early stages of fully understanding.

42. Nonetheless, it is reasonable to state that a sizeable proportion of the US population has growing questions and concern over the hegemony of Big Tech, including the types of claims here brought by Plaintiffs and the class members.

43. There are at least several emerging antitrust proceedings of particular relevance to this case. These include:

- The "Investigation of Competition in Digital Markets" majority staff report and recommendation by the United States House of Representatives Subcommittee on

Antitrust, herein referred to as the "House report." The facts uncovered by the House report applicable to Apple (*Exhibit A)* are hereby wholly incorporated herein.

- A European Commission investigation into the App Store, launched in June 2020. ("The EC investigation").

- A consumer class action antitrust lawsuit filed in 2011 alleging App Store violations of Sherman in the app aftermarket (i.e. Kodak downstream theory). This lawsuit was incorrectly dismissed by a Northern California judge, only to be remanded eight years later by the Supreme Court. *Pepper v. Apple Inc*, 11-cv-6714-YGR. The *Pepper* complaint and findings of fact relevant to and supporting this case are hereby incorporated herein.

- A developer class action antitrust lawsuit filed in 2019 alleging App store violations of Sherman in the app aftermarket, or submarkets. *Cameron et al v, Apple*, 19-cv-3074-YGR. The *Cameron* class is restricted to app developers who sold apps for non-zero prices. Supporting evidence and facts of the *Cameron* complaint are incorporated herein.

- An app distributor lawsuit for Sherman violations was filed in 2020 in Northern California, *Saurikit (aka Cydia) v. Apple*, 20-cv-8733-YGR. *Cydia* alleges it was the first to implement an app store on the iPhone ecosystem, and has been improperly booted from the market by Apple. *Cydia* seeks injunctive relief to require Apple to allow competing App Stores. Likewise, *Epic v. Apple*, 20-cv-5640-YGR seeks such relief to permit the games developer to open competing app games stores. *Epic* is a multinational entertainment company that has invested in substantial work with the Cravath law firm to discover Apple's anti-competitive conduct.  Their discovery is expected to be useful to support our class members claims. By building upon the findings of Cravath (Exhibit B), Plaintiffs' counsel may devote its resources almost entirely to a new branch of discovery:

identifying and assisting countless developers, even small developers of free apps, who have been subjected to anti-competitive practices by Apple. Counsel intends to focus discovery on exposing these stories of developers who have suffered devastation from improperly denied or suppressed apps, representing thousands of lost person-years of advanced programming work. Therefore, by incorporating several examples of "kodak downstream" proceedings and academic papers, this Complaint allows for easier reference for the general public and the Court as to the current state of anti-trust proceeding. ***By incorporating these claims, the modifications made to protect developers of free apps are more readily apparent. Incorporation of academic cited claims and derivative claims pending trial also avoids re-inventing the wheel, and is also intended to prevent Apple from engaging in frivolous dilatory motion practice.***

### House Report

44. The "Investigation of Competition in Digital Markets" majority staff report and recommendation by the United States House of Representatives Subcommittee on Antitrust provides compelling support and evidence supporting the Plaintiffs and class members claims. The report asserts that Apple's control over iOS provides it with gatekeeper power over software distribution on iOS devices. The report declares Apple has "monopoly power over distribution of software applications on iOS devices." The report quotes Apple executives as stating that Apple is "not subject to any meaningful competitive constraint" in this channel. This results in "supra-normal" profits according to the report.

45. Apple makes $2.7 billion annually simply from charging developers $99 to access their platform. This fee is more than quadruple the fee of the nearest rival, and has directly harmed Plaintiffs and class members.

46. The report explains how eliminating IAP tying could be done by allowing other payment processors like PayPal, VISA, etc. to service the market. This tying has directly harmed a large subgroup of Plaintiffs and class members.

47. Apple benefits immensely from a ranking system that favors their own rival apps, according to the report. Some searches reveal "14 Apple apps before showing results from rivals." The report documents that Apple "holds [competitor apps] to a different standard" than its own apps, which is precisely what happened to Plaintiff, and other class members. Such ranking unfairness has directly harmed Plaintiffs and class members.

48. Described is Apple's history of "closely monitoring the success of apps in the App Store, only to copy the most successful." Apple "takes other companies innovative features," which was the case with Plaintiff's app. In sum, Plaintiff and class members have experienced such anti-competitive behavior as described in the report.

49. The House report has an entire section devoted to Apple's "excluding rival apps." A well-known case of Apple's exclusion of parental control and Screen Time apps is described. One developer is mentioned who invested almost $250,000 in a parental control app, only to be told by Apple that this category of apps is disallowed. This pretextual, self-serving exclusion is directly analogous to Apple's exclusion of rival free edutainment apps, as Plaintiff's. Many class members suffered the same fate, resulting in thousands of person-years and tens of billions of dollars of damages.

50. The report describes how apple has "absolute discretion" in approving apps, resulting in "complete tyranny." Just as Plaintiff asserted the heartbreaking experience of being lied to by junior Apple app store reviewers, the House Report goes even further. It says "different reviewers" interpret same apps "differently" with "intentionally…vague" guidelines that consist of "moving goal posts" and "unwritten rules." The report describes the frequent delays of weeks or months (which Plaintiff's app experienced) as "insufferable."

51. The Subcommittee exposed reports that Apple appointed two App Store employees to navigate the waters for Chinese firm Baidu, effectively giving them preferential treatment. Described is CEO Mr. Tim Cook's denial of preferential treatment, followed by seemingly incontrovertible evidence the Subcommittee uncovered that indeed Mr. Cook did seek to favor the Chinese firm. As noted, Plaintiff and other class members never received such hand-holding for their critically important apps.

52. The Subcommittee findings re Apple's anti-competitive behavior are hereby asserted by Plaintiffs and class members.

**Lead Plaintiff – Primary Productions Facts**

53. Plaintiff's blockchain app completed development in mid-2018. Primary Productions developed the business model for the app over a seven-year period. The app sought to educate the public about blockchain wallets by distributing hundreds of millions of dollars of free digital encryption currency, aka cryptocurrency.

54. Apple generally blocked blockchain apps, including blocking "mining" activity, and even environmentally friendly "staking" activity, purporting it was harmful to the iPhone. Mac users, however, could mine bitcoin, and no widespread harm is known to have happened to Mac computers from mining.

55. Apple proffered a stream of pretextual reasons to deny Plaintiff's app, even arguing it was "frivolous" and "caused risk-gambling," when neither were the case; in fact, Apple Arcade had numerous "frivolous" apps that were deeply unpopular with users, necessitating their prompt removal from the arcade.

56. Plaintiff's development team was based in the Ukraine, under contract and direction from the Maine-based management of Primary Productions. All programmers of Plaintiff's app were located in Lviv, Ukraine for the entire duration of the project.

57. Apple is a monopoly as defined by the Sherman Antitrust Act.

58. Apple has the ability to, and has in the past, restrained legally permissible, reasonable internet trade when it blocked a large group of cryptocurrency apps, and free gaming apps, to restrict trade in favor of its own competing Apple Arcade and other partners and cronies economic interests.

59. Apple possesses vast userbase studies. Consumer willingness to pay and ability to pay studies have been a focus of Apple, Inc. Included in these studies, are evidence of the barriers and difficulties their users would face in accessing the internet without their Apple device. For example, a user who purchased a $1000 iPhone on a financing plan may not have the financial means to access the internet with an alternate device. Apple has substantial investments in cost-analysis literally tracking every penny its users does and can spend. From these vast economic studies, Apple knows it holds monopoly like power over many users' ability to exit the Apple ecosystem and access the internet through other means. Apple should produce all such economic data, under FRCP discovery rules, should they purport no such monopolistic controls exist.

60. Plaintiff has suffered financial losses, because of Defendant's illegal actions restraining market competition.

61. In so restricting competition, Apple was also saying that citizens shouldn't be allowed enjoy the full benefit of their hardware purchases. Consumers couldn't engage in blockchain uses, novelty games related to blockchain, and were presented with limited marketplaces – Apple Arcade, for example – vastly limiting consumer choice. In short, Apple curtailed the freedoms of consumers – who paid for their hardware – and developers, like Plaintiff, who sought to provide novel functionality.

62. In so doing, Apple was infringing upon the rights of Plaintiff, all class members, as well as ordinary citizens to engage in free, unrestricted commerce and information exchange on the internet. Apple harmed competition, as per Sherman, which caused damages to Plaintiff, class members, and consumers.

63. Defendant Apple allowed at least two competing apps to engage in the "risk gambling" behavior Apple accused Plaintiff of partaking. This caused Plaintiff to lose the valuable first-mover advantage of its blockchain giveaway app.

64. Allowing the aforementioned competing apps, including Apple's cancelled, unpopular and simplistic Arcade apps, was intentional, flagrant restraint of trade.

65. By disallowing Plaintiff's app, Defendant Apple's monopolistic practices caused a permanent loss of educational experience for potential blockchain currency newcomers.

66. Access to the national internet backbone is theoretically possible without using Apple or Google products, such as with a generic UNIX web browser. But access to the smartphone enhanced backbone is not possible, without local app SDK tools governed by Apple, illicitly.

67. In practicality, many individuals, especially elderly and children, only learn how to access the internet using a friend or relative's Apple device. Additionally, GPS location data does not typically exist on a generic web browser. As such, economically efficient geolocation of symptoms was only possible using either Apple's smartphone, or its rival.

68. Native apps are favored by customers by almost 90% over web browser apps. Native apps provide more functionality, which would be helpful with Plaintiff's app. As such, "smartphone enhanced internet commerce and information flow" requires access to the app SDK, rather than mere web browser experience.

69. As such, Apple is a *de facto* monopoly of access to the national internet backbone, or at least, the smartphone enhanced functional internet backbone.

70. There exists tens of millions of individuals in the United States who do not know how to access the internet without using an iOS device.

71. These individuals rely upon access to the internet to perform critical commerce activity, engage in protected free speech, and obtain lifesaving medical advice and treatments.

72. A third-party developer, seeking to help facilitate those above enumerated activities, is required to sign Apple's Developer Agreement and ask permission from Apple to distribute their application.

73. There was no reasonable grounds for Apple to deny the Plaintiff's app from public distribution.

74. Apple has an App Review Board that decides which apps it will permit on the App Store.

75. The App Review Board has denied substantial numbers of legitimate, reasonable applications, representing thousands of man-years of work and labor, collectively. This harms competition, under Sherman, and damages flowed to Plaintiff and class members.

76. Plaintiff and all class members, each have a unique app and unique story to tell. A common thread is that each app was denied, either in outright fashion, or via ranking suppression, on the basis of pretextual excuses by Apple.

77. These pretextual excuses are exemplified in the House report, as well as academic papers such as the Yale SOM Thurman Arnold Project's Digital Platform Series on "The Antitrust Case Against Apple" (*Kotapati et al*, May 2020) which is hereby incorporated. The Yale SOM paper documents the pretextual excuses Apple used to block rival apps.

78. Plaintiff and class members faced nearly identical experiences to that documented by the House report and *Kotapati et al*.

79. Plaintiff has personally witnessed the inappropriate rejection of apps representing several man-years, and asserts claims herein for all illegally restrained marketplace violations.  The exact number of man-years illegally wasted by Apple, possibly tens of thousands, will be sought under early FRCP discovery rules.

80. All of the aforementioned examples restricted output, quality, and innovation in the downstream App market for smartphone users. It restrained commerce and information flow amongst smartphone enabled internet access devices. We expect many more stories to emerge as Plaintiff's first discovery request to Defendant Apple will be a list of every rejected app team and supporting documentation.

81. When the App Review Board denies an app, they assign this to a junior staff member who must make the unpleasant call to a developer team to inform them that their team's work of months or years is being denied access to the global internet backbone.

82. These are often difficult conversations that understandably cause distress for both parties. Upon information and belief, Apple's junior App Review Board employees (who are only

known to the developers on an informal first name basis) suffer considerable psychological distress from repeatedly shooting down the dreams, and years of work-product of the app developers.

83. In short, Apple has junior App Store employees do their "dirty work" of unreasonably disallowing perfectly legal and legitimate apps that meet all standards and requirements.

84. The apps are, in fact, disallowed to foster Apple's monopolistic goals, rather than to protect the public from low-quality or illegal applications. Upon information and belief, Apple routinely employs cronyism when it allows one developer's app, but disallows similar apps from other developers. It may flagrantly favor its own rival apps, likewise, limiting competition and excluding smartphone enhanced internet users' experience. This is particularly evident and distressing to the aforementioned junior App Reviewers, who are aware they are misleading and/or lying to the other developers.

85. This well-known issue within the company is one reason Apple is aware that antitrust laws will, at some point, challenge the *status quo*. On February 22, 2021, Apple's CEO Tim Cook notified Apple Shareholders that antitrust compliance is a future risk to Apple's profits. Included in the memorandum is new language: "The Audit Committee and Board regularly review and discuss with management Apple's antitrust risks. Apple's Antitrust Compliance Officer is responsible for the development, review, and execution of Apple's Antitrust Compliance Program and regularly reports to the Audit Committee. These reports cover, among other matters, the alignment of the program with Apple's potential antitrust risks, and the effectiveness of the program's design in detecting and preventing antitrust issues and promoting compliance with laws and Apple policies."

86. Discovery will demonstrate that Apple is aware of numerous instances, such as Primary Productions' creative educational software, where they violated antitrust law by disallowing reasonable use of their devices and App Store, restraining interstate commerce.

87. Historically, most internet applications were free and open-sourced, under the MIT/GNU software licensing paradigm. In the past decade, Defendant Apple has drastically changed the free, open internet to one of massive, trust-like corporate profits and control.

88. Apple has internal records that document numerous examples of how their market control, technology, and/or restrictive policies have willingly and unwillingly damaged smaller entities and individuals. Under FRCP, these records shall be produced by Apple.

89. As of the time of filing, at state governments and multiple friendly foreign governments (Australia, Canada) have announced legislation meant to prevent Big Tech companies like Apple from abusing their monopoly powers. As discovery will show, Apple is aware of numerous yet-announced government inquiries and preliminary legislation meant to address the type of wrongs Apple inflicted on Plaintiff.

90. Apple enjoys, nonetheless, an esteemed position in society which is reflected in its $3trillion valuation. Antitrust Law, in theory, seeks to balance the cost to society of regulating a top performing, well admired company's value while assisting smaller companies harmed by the monopoly. In abstract terms, a sliding scale exists where antitrust enforcement saving thousands of companies the size of Plaintiff is weighed against the losses incurred by regulating a monopoly (Apple). In practicality, properly effected Antitrust regulation vastly benefits society by rescuing the value of smaller companies while allowing the monopoly to continue a legal value creation path. There exists no reason in theory why Apple could not also benefit from ceasing to engage in the anti-competitive

acts describe herein, further increasing its value. For example, Apple could implement Plaintiffs' suggestion of an independent App Court for due process, and forego their divine right of kings approach. They might even profit as more developers innovate, and consumers are better able to enjoy their smartphone investment. Therefore, injunctive action to protect small entities does not, in theory, necessitate a zero-sum scenario at Apple's expense.

91. At the very least, this plausible theory is part of an ongoing national (and global) discussion.

92. By definition, this theory and underlying claims of this lawsuit are not frivolous.

93. Apple falsely asserted these claims and stories of real loss by countless developers was frivolous in a recent pleading.

94. Apple has not made any effort to retract their false statements, despite being notified to do so.

95. Plaintiff also represents a telecommunications app, which pioneered its service field in 2015 and had been top ranked in the App Store.

96. Within a year or so of complaining about copycats infringing on it's patent, Apple demoted the app to the bottom of the App Store, replacing it with a clearly inferior copycat from Israeli.

97. Apple apparently did not like the developer-patent holder telling them "Apple threw us under the bus" with regards to the patent.

98. Apple then proceeded to issue false statements, constituting wire fraud (see RICO complaint) that the service violated iOS privacy standards. Dozens of other apps, and indeed Apple's own partners at major telco companies, offer exactly the same such service.

99. Plaintiff, class members, and their attorney hereby represent substantial Sherman Act violating app rejections. Plaintiff and counsel seek expedited and prompt discovery of Apple "developer.apple.com" systems to identify other developers who have been victim to such wrongs by Apple, including app ranking suppression, inappropriate app disallowments, retaliations, excessive rent fees, and being subjected to false statements and harassment by the App Review team.

**Claim Theory**

100. The introduction to this Amended Complaint presented an overview of the unique aspects of Plaintiff's claim theory. Most other claim theories advancing in other courts against Apple relate to the so-called "single brand theory" or "Kodak downstream theory."

101. These claims have gone to bench trial or proceeded to discovery. For that reason, and to protect all potential class members, we assert these single-brand theories below, in addition to our smartphone enhanced bundle monopsony theory and related institutional app marketplace. Hence, approximately nine pages of this 65 page complaint intentionally incorporate claim theories by other Apple cases pending under antitrust cause. Some of these other cases may be subject to expired statutes of limitations that do not exist in Plaintiffs' case, and hence, incorporation of these claims preserves the collective effort of remedying Apple's concerning business practices.

102. Apple has filed to dismiss our single-brand claims of ours in the Complaint in this Court, arguing that theory is "strongly disfavored." Indeed, many brands, clearly not monopolists, could have such a claim wrongly brought under that theory. However, in the case where Apple's single brand controls 80% of internet commerce, and where some SCOTUS Justices have said "common carrier law" of smartphones is "inevitable,"

pleading single-brand market theories is reasonable and should survive dispository motions. Nonetheless, we assert that our monopsony theory is easier to apply and results in better enforcement of antitrust laws. For the foregoing reasons, we now outline all of the claim theories used in our causes of actions, some of which are new or substantially modified, some of which are already familiar to this Court and indeed stem from its dockets.

**Apple is a monopolist in the market for iOS app and payment processing (IAP) distribution services.**

The Market

103.    Apple possesses monopoly power in the domestic and global market for iOS app distribution, and in the market/aftermarket for iOS app payment processing. Customers for each include app developers and consumers using iOS devices, and they exist as aftermarkets to iOS devices. This is a well-known, well applied "Kodak downstream" marketplace theory cited throughout academic, government reports, and other Big Tech antitrust lawsuits.

104.    In designing iOS and the iPhone, Apple was faced with a problem that previously plagued its desktop and laptop computers throughout the 1980s and 1990s. In that era, Apple took an almost entirely proprietary approach to its hardware and software. That approach, however, severely limited the scope of Apple's software offerings and put it at a decided competitive disadvantage against others, such as Microsoft and OEMs that used the Windows operating system, who took a much more open approach to software. Apple thus carved out only a very small, niche market share during that era, and in fact almost went bankrupt as a result. Indeed, it was not until Apple relented and stopped trying to

prevent third party developers from operating in its software application markets that its fortunes turned around. Ironically, at the time the US government was concerned with potential Microsoft antitrust concerns that their web browser was too dominant. In comparison to the tyrannical, monopolistic tentacles Apple has since grown, old concerns over early tech companies seems nostalgic, even laughable.

105.     Guided by this historical and popularity or newly emerging app markets, Apple realized soon after introducing the iPhone that it needed to offer at least the appearance of broad choice of software to use on its new smartphone. This was particularly so because other companies—notably, Google, Microsoft, and Blackberry—were developing their own smartphones and had a more open history regarding third parties' ability to create and sell applications for their respective platforms. Apple therefore, as discussed above, introduced the App Store in July 2008 and thereafter actively tried to encourage the appearance of a robust market for iOS apps. Touting the choice and breadth of apps the App Store presumably enabled, Apple has consistently used the availability of third-party applications to fuel the demand for the iPhone and its iOS operating system. Indeed, Apple promoted the iPhone by heavily advertising third party applications and stating, "there's an app for that."

106.     Apple's efforts have succeeded to drive demand for its iOS devices, including the iPhone, in competition with devices running other operating systems. In the U.S. alone, consumers own nearly 200 million iPhones. All of those devices run only iOS applications. All the aforementioned competing devices have largely been driven by Apple out of the market for smartphone enhanced internet commerce.

107.     High switching costs prevent users from switching from one operating system to another operating system after they initially purchase a mobile device. These switching costs increase over time for a variety of reasons, including, among other things, the cost of the mobile device; the user's familiarity with the operating system and unwillingness to learn a different operating system; the user's familiarity with apps on that operating system; the users' costs sunk into purchased applications that are not compatible with other operating systems, which is amplified by the restrictions on the App Store and the inability of App Store developers to communicate freely with their users; and the costs of hardware purchased to support the mobile devices utilizing that operating system. Moreover, switching costs for mobile devices—particularly for iOS devices, due to Apple's typically extreme practices—have increased dramatically in recent years with the advent of cloud computing.

108.     These high switching costs, which are not readily apparent to the vast majority of iPhone users before they purchase their devices, were nevertheless apparent to Apple early on. This led it to realize that it could make enormous additional profits if it exerted complete control over the various aftermarkets into which iPhone users were locked once they purchased their device.

109.     Users who want apps on their iOS devices *must* download those applications from Apple's iOS App Store app. By technological design and contractual restraint, Apple does not allow other third party services to distribute iOS apps. Furthermore, Apple has designed iOS in such a way that no iOS app distributor is available or largely even useable on iOS devices. In this way, Apple is significantly different than other companies. For example, in the Android operating system, Android users can download Android applications from

multiple application marketplaces—including Google's Play Store, Amazon's Appstore, and Samsung's Galaxy Store. Apple takes multiple, active steps to prevent anything similar for iOS devices.

110.     App developers, who are also customers in the iOS app distribution market— because the app distributor(s) offer a service and product that facilitates locating, selling, and installing the developer's app—face a similar reality. The existence of other mobile device operating systems is meaningless to developers who program apps and in-app products for use on iOS devices, because it does not change the markets into which those apps are sold and developers cannot take a one-size-fits-all approach to app development.

111.     A move away from the iOS system would mean that a developer could no longer offer its iOS apps or in-app products to hundreds of millions of consumers, and the developer would have no substitute available, because it could not sell its iOS app into a different market for mobile apps, such as for the Android or Windows operating systems. Notably, Apple admits that it shuts out all competition from app distribution to iOS device consumers, ostensibly to protect its device customers from bad apps and malware. But herein lies a recurrent theme of pretextual excuses at Apple. Apple's smartphone competitors explicitly permit competing app distribution services, which shows that Apple's actions and justifications to the contrary are pretense.

112.     Apple also permits third party app distribution to its macOS-compatible devices. The Mac is a part of a safe, longstanding computer ecosystem that has tens of millions of loyal users. Bad apps and malware never plagued the Mac ecosystem, despite their open app distribution framework. Brick and Mortar distribution outlets, and even web-based distribution outlets have never resulted in significant safety or quality issues, at least not

so much as to deter one from using the Mac ecosystem. Apple's double-standard cannot be more evident, when one compares the Mac and the iOS ecosystems.

113.     In a broader definition, the market is the entire interstate, smartphone enhanced commerce and information flow transacted via the national internet backbone. Smartphone enhancements currently include altimeters, barometers, gyroscopes, cameras, fingerprint sensors, GPS, microphones, EKG readers, pulse oximeters, and even potentially blood sugar monitors. Consumers essentially purchase a bundle of sensors from Apple, with an operating system (iOS) that creates an intuitive interface that connects these sensors to the national internet backbone. Consumers have an expectation, and a right, to benefit from the network effects (i.e. critical mass and/or economy-of-scales) of interacting with fellow smartphone users throughout the country. Such interaction is not possible through a web browser alone. These sensors require sophisticated API and SDKs not accessible though bare-bones TCP/IP internet protocols. In other words, Apple's iOS is the toolkit that allows consumers to benefit from the hardware they paid for.

114.     Apple exclusively controls approximately 65% of the smartphone enhanced interstate communication pathways, as defined in this device market. Plaintiff reserves the right to apply either of the aforementioned market definitions interchangeably (i.e. Kodak downstream vs. device submarket), as appropriate for different apps and different claim scenarios.

**Alternatively, Apple is an attempted monopolist in the domestic and overseas market for iOS app and IAP distribution services.**

115.     Alternatively, for the foregoing reasons, Apple is an attempted monopolist in the market for iOS app and IAP distribution services. Given that the facts alleged amply support a finding that Apple has always maintained monopoly status in this U.S. market, *a*

*fortiori* they support a finding that Apple is attempting to monopolize the distribution-services market by improper means.

116.     In our broader market definition of smartphone-enhanced internet backbone control, Apple's threshold of approximately 60% is sufficient to sustain an attempted monopolization theory.

**Alternatively, Apple behaves as a monopsonist retailer, or attempted monopsonist retailer, of iOS apps and related digital products.**

117.     Alternatively, by requiring that it be the sole retailer of iOS developers' digital products, Apple acts as a monopsonist, or attempted monopsonist. A monopsonist is a buy-side monopolize. The circumstances and effects are essentially the same as with monopoly or attempted monopoly: by Apple's behavior as alleged herein, Apple uses its monopsony power as the sole retailer-distributor for iOS apps and IAP to pay iOS developers below the price they would obtain in a competitive market for their products. The effect is the same as if Apple, in a wholesale-retail model, had depressed wholesale prices by way of its anti-competitive market power and behavior.

118.     Here price may be the app cost itself, the IAP price, or the net proceeds relayed to the developer from sponsorships, partnerships, advertising revenue, and/or brand goodwill. Apple's own apps generate sponsorships, partnerships, advertising revenue and goodwill for Apple. Ad revenues, in particular, have a limited supply: there is a finite number of ad time each iOS user can view each day. By restricting competition for its own apps and those of its monopsony cronies, strategic, and otherwise chosen partners, Apple illegally diverts profits away from the developer apps.

**Apple's practices with respect to the App Store further restrain and injure competition in the U.S. market for iOS app and in-app-product distribution services, where already there are high barriers to entry.**

119.     Apple's unlawful practices in aid of establishing and maintaining its monopoly restrain and injure competition in the domestic market for iOS app and in-app-product distribution services, where already there are high barriers to entry. Even were it not for Apple shutting out competitors by design, market-participant hopefuls would still need the resources to build and maintain the app store client for iOS devices, to program and maintain the requisite software and algorithms going forward, to advertise the client and the steps needed to install it, among other barriers. The European Commission has concluded that there are high barriers to entering the market for app distribution via app stores.

**Apple's unlawful practices harm competition, developers, and consumers of apps and in-app products, too.**

120.     Apple's monopolistic practices in the U.S. market for iOS app and in-app-product distribution services harm competition by depressing the output of distribution transactions. Additionally, these practices harm iOS device consumers by robbing them of innovation and choice. Apple's distribution charges are so high that undoubtedly they keep developers out of the App Store; why develop an app or platform that will be have economically inefficient rents? Developers are arbitrarily blocked from developing apps, under constantly changing, arbitrary guidelines that often exempt Apple's cronies. Likewise, these practices harm consumers owning iOS mobile devices because they rob them of more other apps that might be truly useful, fun, or innovative. Apple's minimum price harms consumers, as a developer cannot offer an app for $0.49, for example. Additionally, the fact that apps are not discoverable due poor organization of the iOS app store hurts developers and buyers of iOS apps and in-app products as well. Unquestionably,

Apple's anti-competitive mandate that it be the sole provider of distribution services, and that it run the lone iOS app store, hurts competition greatly.

**Apple harms consumers and competition by depressing output.**

121.     Evidence shows that consumers of app-store products are quite price sensitive. Apple's high transaction fees, and the existence of minimal fees, inhibit sales of products sold via the App Store. Thus, distribution transactions are inhibited as well. In other words, Apple's fees depress output.

**Apple's behavior stifles innovation.**

122.     Apple's abusive monopoly also stifles innovation in apps—another way it hurts competition generally. Other vibrant app stores would mean more places for featuring apps. With so many apps available on the market, massive volumes of product can and does get lost in the App Store. Consumers, as well as developers and competition generally, would benefit from other venues that would surface good, new product and encourage the development of yet more and better apps— all of which would engender more output in the market here at issue.

**Apple harms developers by denying them the opportunity to choose other means to get paid for their work.**

123.     Apple's aggressive, anti-competitive behavior diminishes the choice offered by endeavors that compensate developers of free apps through other means, such as ad revenue and sponsorships. *Cameron et al* explains in detail the failure of Amazon Underground, a free app marketplace, which stemmed from Apple's anti-competitive practices.

124.     Plaintiffs were damaged through lost opportunities to get paid for their work. Plaintiffs created apps of substantial value but were paid a price of zero by Apple – in the

cases of disallowance or ranking suppression. As a monopsonist, Apple had full say in setting this zero price, which stifled innovation and excluded rivals. Alternatively, as a monopolist, Apple underpaid developers by 30% and excluded rivals. In the case of Primary Productions, either monopoly or monopsony theory applies in that prices were artificially manipulated by Apple, Apple benefitted through their own apps, and the consumer lost. For example, Plaintiff's may have offered a free app, sponsored through advertising. For users who wanted to obtain higher cryptocurrency balances, a minimal $0.49 might app offering mining software would have been offered, had it been allowed. However, Apple sets a minimum price tag of $0.99, which is higher than Apple Arcade apps that are bundled. Downstream benefits to app publishers include brand goodwill, partnerships, and potentially ad revenue. Apple's own apps benefit from these, especially brand goodwill. As a monopsonist buyer, when Apple blocked an app like Plaintiff's, it effectively paid the developer zero, reaping the brand goodwill and finite ad revenue for its own rival apps, including Apple Arcade.  As a monopolist distributer, Apple held a 30% excessive rent, charged developers $99 unnecessarily, and excluded competition – here, many blockchain apps, and many free giveaway apps (except those of cronies). These are illustrative examples only but suggest likely and common scenarios that applied to Plaintiff and class members.

**Apple harms consumers of its distribution services by way of supra-competitive pricing and other pricing mandates.**

125.      There is no valid, pro-competitive, or otherwise justified reason for Apple's 30% transaction rate, which it has maintained since the opening of its App Store. Rather, this

unnatural price stability, under the circumstances alleged herein, is a sure sign of Apple's unlawful acquisition of monopoly power and the abuse of that market power.

Nor do the facts and circumstances of app and in-app product distribution give rise to any pro-competitive justification for Apple's contractual terms requiring $.99 minimum pricing for paid apps and in-app products, or its end-in-$.99 pricing mandate. These, too, are abuses of Apple's improperly obtained monopoly power.

**Apple has admitted that the Plaintiff class has standing in this lawsuit.**

126.     Apple admits that iOS apps are distributed solely through its App Store. Ostensibly, this is so that it can review them "for malware and similar issues," though this is certainly something other distributors could do.

127.      According to Apple, "[d]evelopers are the ones who purchase distribution [from it], not consumers."

128.     As between consumers of apps and in-app products vs. consumers of its app and in- app-product distribution services, Apple admits that distributors have antitrust standing. In briefing to the Ninth Circuit, Apple has stated: "The software developers who are directly impacted by Apple's 30% commission absolutely would have antitrust standing to bring a monopolization case, if they wanted to . . . ." "App developers have standing under *Illinois Brick* to argue whatever they want because they are direct purchasers of distribution services from Apple, and if they want to argue, for example, that their consent [to Apple's fees] was coerced by Apple's market power, they can." With respect to *Illinois Brick* issues, "[a]pp developers are the ones who have antitrust standing to bring any claim about Apple's 'monopolization' of Apps distribution."

129.       Similarly, in briefing to the U.S. Supreme Court, Apple has stated: "The developer is also the first person to bear the alleged overcharge on the allegedly monopolized service, and by that definition also the 'direct purchaser.'" According to Apple, "it is plainly the iOS developers—the

130.       Finally, as Apple told the Supreme Court, "the first party that directly pays an overcharge"—here, the developers, per its own admissions—"has a complete and undiluted cause of action for the entire overcharge." According to Apple, Supreme Court precedent mandates that "'the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party" injured in his business or property" within the meaning of the [Clayton Act].'"[1] Apple stated: the Supreme Court's prior "decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), gives developers a claim for 100% of any overcharge." Per Apple, "*Hanover Shoe* 'concentrate[s] the full recovery for the overcharge' in the direct purchaser's hands."

131.       There is simply no doubt in Apple's view that developers, as opposed to app and in-app product consumers, are the proper plaintiffs in a suit regarding its iOS distribution-service fees. As it has told the Supreme Court, "[t]here is no 'next best plaintiff' theory that permits indirect purchasers [such as consumers of the apps and in-app products themselves] to secure their own standing by undermining the claims of those who first bear an alleged overcharge"—here, the iOS developers who are the plaintiffs and putative class members. (See *Cameron v. Apple* Complaint, pages 30-32)

132.       But even without these admissions, the Supreme Court of the United States recently recognized developer standing in this matter. As the Court put it with respect to a monopsony case, which plaintiffs plead in the alternative here:

And it could be that some upstream app developers will also sue Apple on a monopsony theory. In this instance, the two suits would rely on fundamentally different theories of harm and would not assert dueling claims to a "common fund," as that term was used in *Illinois Brick*. The consumers seek damages based on the difference between the price they paid and the competitive price. The app developers would seek lost profits that they could have earned in a competitive retail market. *Illinois Brick* does not bar either category of suit.

133.   The antitrust injuries alleged herein, including harm to developers of iOS apps and in- app products, competition, and consumers of iOS devices, have occurred in the U.S. market for iOS app and in-app-product distribution services (or, alternatively, in the U.S. market for iOS app and in- app-product retailing services). Apple monopolizes this market (or acts as a monopsonist retailer) as alleged herein.

134.   Due to the incompatibility of Apple's iOS with Google's Android OS, as well as the incompatibility of iOS and Android OS apps as alleged herein, Google Play offers no competition to, and is not a substitute for, the App Store. Nor do other distribution service providers such as Amazon or Microsoft, which also do not provide distribution for iOS apps and in-app products (and which Apple bars from competing in any event). Even with a small but significant—or large—price increase, whatever the duration, plaintiff developers have nowhere to go to serve the iOS market for which they have developed apps and in-app products—they need iOS distribution services. And Apple is the sole, monopolistic provider thanks to its deliberate exclusion of competition.

135.   Alternatively, even if one were to consider *all* distribution services for any apps or in- app products, whatever the underlying operating system, or whatever the platform or devices, Apple's distribution services for iOS apps and in-app products would form a distinct relevant sub- market.

136.     Apple's restraints on competition directly impact the U.S. market for iOS app and in- app-product distribution services as alleged herein.

137.     As it has admitted, Apple is a direct seller of iOS distribution services to iOS developers.

138.     Plaintiffs seek relief on behalf of themselves and other developers. Insofar as the App Store may be or is a two-sided platform, lower prices to developers for distribution services (or for retail commissions) would not lead to any discernible negative indirect network effects under the circumstances described herein. For example, unlike with respect to credit-card transaction platforms, lower fees or prices would not mean less money available to pay rebates or rewards to consumers. To the contrary, Apple does not share its transaction fees with consumers. Here, Apple's restraints do not help to establish or enhance participation *inter se* developers and consumers, nor do they help to prevent erosion in participation. In fact, Apple can point to no considerations that countervail the propriety of the monetary and injunctive relief that plaintiffs seek.

139.     Plaintiffs bring this proposed class action pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

140.     Plaintiffs bring this action on behalf of themselves and the following nationwide class, for monetary and injunctive relief based on violations of the Sherman Act:

>     *All U.S. developer-programmers of any Apple iOS application that was excluded through disallowance and/or ranking suppression, or non-participation in DPLA on Apple's iOS App Store, who signed, or did not sign, the DPLA.*

141.     Not included in this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and

representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

142.    Plaintiffs also bring this action on behalf of themselves and the following nationwide class, for monetary and injunctive relief based on violations of the Sherman Act:

> *All U.S. developers of any Apple iOS application or in-app product subject to a 30% sales commission Apple's iOS App Store.*

143.    Not included in this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

144.    Plaintiffs also bring this action on behalf of themselves and the following nationwide class, for monetary and injunctive relief based on violations of the Sherman Act:

> *The millions of U.S.-based iOS developers who were required to sign the DPLA and pay Apple $99 simply to access the 60% of the population that uses smartphone enhanced services (i.e. iOS) over the national internet backbone.*

145.    Not included in this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

146.    **Numerosity:** The exact number of the members of the proposed classes is unknown and is not available to the plaintiffs at this time, but upon information and belief, supported

by Apple's past statements, the classes will consist of at least thousands of members such that individual joinder in this case is impracticable.

147.     **Commonality:** Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed classes. These include, but are not limited to: a. Whether there is a U.S. market for iOS app and in-app-product distribution services; b. Alternatively, whether there is a U.S. sub-market for iOS app and in-app-product distribution services; c. Whether Apple has unlawfully monopolized, or attempted to monopolize, the U.S. market for iOS app and in-app-product distribution services, including by way of the contractual terms, policies, practices, mandates, and restraints described herein; d. Whether competition in the U.S. market for iOS app and in-app-product distribution services has been restrained and harmed by Apple's monopolization, or attempted monopolization, of that market; e. Alternatively, whether Apple has behaved as a monopsonist, or attempted monopsonist, retailer of iOS apps and in-app products as alleged herein; f. Whether plaintiffs and members of the proposed classes are entitled to declaratory or injunctive relief to halt Apple's unlawful practices, and to their attorney fees, costs, and expenses; g. Whether plaintiffs and members of the proposed classes are otherwise entitled to any damages, including treble damages, or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and h. Whether plaintiffs and members of the proposed classes are entitled to any damages, including treble damages, or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

148.     **Typicality:** Plaintiffs' claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Apple's liability are the same and resulted in injury to plaintiffs and all of the other members of the proposed classes.

149.     **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed classes both fairly and adequately. They have retained counsel able to engage, and experienced with, complex litigation. Plaintiffs have no interests that are antagonistic to those of the proposed classes, and their interests do not conflict with the interests of the proposed class members he seeks to represent.

150.     **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the defendant. Certification of plaintiffs' proposed classes would prevent these undesirable outcomes.

151.     **Injunctive and declaratory relief:** By way of its conduct described in this complaint, Apple has acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

152.     **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex

factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## IV.   CAUSES OF ACTION

### COUNT I
### (SHERMAN ACT  15 U.S.C § 2)
### VIOLATION OF THE SHERMAN ACT –MONOPOLIZATION/MONOPSONY

153.      Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

154.      Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide class described above.

155.      The relevant market is the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps and in-app products. Alternatively, the relevant market is the U.S. retailing of iOS apps and related digital products.

156.      Apple has gained and maintains monopoly power in the relevant market (or sub-market) by improper and unlawful means. Alternatively, Apple, as the sole U.S. retailer of iOS apps and in-app products, and, upon information and belief, a seller of a significant sum of in-app subscriptions, acts as a monopsonist in the relevant market. More specifically, Apple has willfully acquired and maintained such power by its patently exclusionary conduct, including its refusal to allow iOS device owners to purchase iOS apps and IAP other than mandating that iOS developers who sell through the App Store cannot sell their apps though any other means that are meant to reach iOS device consumers. Each of these instances of exclusionary conduct is also directly exclusionary in the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps and

related digital products, because they ensure that iOS app developers must use Apple's distribution services to reach iOS device owners.

157.    For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant market.

158.    Apple has the power to exclude competition in the relevant market and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to maintain and expand its monopoly power in that market.

159.    Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for iOS app and IAP distribution services. Specifically, the DPLA itself is an oppressive monopoly contract, forbidden by Sherman, which seeks to tell every programmer how to run her or her business. Additional contracts and agreements may and will be revealed in discovery, the contours of which are evident from the aforementioned facts.

160.    Apple has behaved as alleged herein to maintain and grow its monopoly in the U.S. market for iOS app and IAP distribution services, with the effect being that competition is foreclosed and that consumer choice is gravely diminished. So is innovation. Additionally, Apple has abused its market power by insisting on 30% transaction fees, minimum price fixing, and end-in- $.99 pricing as alleged herein.

161.    There is no business necessity or other pro-competitive justification for Apple's conduct. Apple's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality, and lowered output and consumer choice.

162.    Plaintiffs and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including by way

of overpaying for iOS app and IAP distribution services. Additionally, or alternatively, plaintiffs and the federal law class have suffered damages because they were underpaid by monopsonist Apple as a result of the Apple's conduct as described herein. All injuries claimed herein flowed from reduced competition, and therefore, are the type protected by Sherman.

163.    Plaintiffs and the federal law class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction barring this anti-competitive conduct.

**COUNT II**
**(SHERMAN ACT  15 U.S.C § 2)**
**VIOLATION OF THE SHERMAN ACT – ATTEMPTED**
**MONOPOLIZATION/MONOPSONY**

164.     Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

165.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide federal law class described above.

166.    The relevant market is the domestic market for iOS app and IAP distribution services. Alternatively, the relevant market is the domestic market for retailing iOS app and related IAP digital products.

167.    Apple has attempted to monopolize the U.S. market for iOS app and IAP distribution services. Alternatively, Apple, as the sole U.S. retailer of iOS apps and IAP digital products, and, upon information and belief, a seller of a significant sum of in-app subscriptions, is an attempted monopsonist in the relevant market. More specifically, Apple has willfully acquired and maintained market power by its patently exclusionary conduct, including its refusal to allow iOS device owners to purchase iOS apps and IAP other than through its own App Store; refusing to allow other app stores to be allowed on its devices;

and mandating that iOS developers who sell through the App Store cannot sell their apps though any other means that are meant to reach iOS device consumers. Each of these instances of exclusionary conduct is also directly exclusionary in the U.S. market for iOS app and in-app-product distribution services, or for retailing iOS apps, in-app products, or subscriptions, because they ensure that iOS app developers must use Apple's distribution services to reach iOS device owners.

168.    Apple's anti-competitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market (or sub-market) for iOS app and in-app-product distribution services.

169.    Apple has a specific intent to achieve monopoly power in the U.S. market for iOS app and in-app-product distribution services, or for retailing iOS apps, in-app products, or subscriptions. Now, and if its unlawful restraints are not checked, Apple has a dangerous probably of success.

170.    Apple has the power to exclude competition in the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps & IAP and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

171.    Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for iOS app and in-app- product distribution services, or for retailing iOS apps, in-app products, or subscriptions.

172.    Apple has behaved as alleged herein in an attempt to obtain a monopoly in the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps and IAP with the effect being that competition is foreclosed and that consumer choice is gravely

diminished. So is innovation. Additionally, Apple has abused its market power by charging supra-competitive 30% distribution fees and mandating minimum prices and end-in-$.99 pricing for iOS apps and in-app products.

173.  There is no business necessity or other pro-competitive justification for Apple's conduct. Apple's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality, and lowered output and consumer choice.

174.  Plaintiffs and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including by way of overpaying for iOS app and IAP distribution services. Additionally, or alternatively, plaintiffs and the federal law class have suffered damages because they were underpaid by Apple as a result of the Apple's conduct as described herein. These underpayments were specifically levied by Apple to reduce competition and restrain trade, and Plaintiff and class members are some of the downstream victims of this anti-competitive behavior.

175.  Plaintiffs and the federal law class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction barring this anti-competitive conduct.

### COUNT III
### (Sherman Act § 2)
### DENIAL OF ESSENTIAL FACILITY IN THE iOS APP DISTRIBUTION MARKET

176.  Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

177.  Apple's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 2.

178.     The market for smartphone enhanced commerce and information flow transacted via the national internet backbone is a valid antitrust market.

179.     Apple holds monopoly power in the market for smartphone device enhanced commerce and information flow transacted via the national internet backbone.

180.     Apple unlawfully maintains its monopoly power in the market for smartphone enhanced commerce and information flow transacted via the national internet backbone through its unlawful denial to Plaintiffs and other app developers of an essential facility— access to iOS device userbase—which prevents them from competing in the market.

181.     Apple controls access to iOS userbase, which is essential to effective competition in the market for smartphone enhanced commerce and information flow transacted via the national internet backbone access devices.

182.     App developers are unable to reasonably or practically duplicate the entire infrastructure for smartphone enhanced commerce and information flow transacted via the national internet backbone. Duplicating the entire internet and iPhone userbase is about as feasible as recreating a mountain — in reference to binding caselaw from *Aspen Skiing Co* (472 U.S. 585, 1985). On the other hand, it is technically feasible, and in fact practical, for Apple to provide iOS userbase access to Plaintiffs and other app developers, and it would not interfere with or significantly inhibit Apple's ability to conduct its business.

183.     In fact, providing this access is exactly what Apple has done for forty years with the Mac product ecosystem, a popular and successful computing platform.

184.     Apple's denial of access to iOS has no legitimate business purpose, and serves only to assist Apple in maintaining its unlawful monopoly position in the increasingly critically important market.

185.     Through its denial of its essential facility, Apple maintains its monopoly power in the market.

186.     Apple's conduct affects a substantial volume of interstate as well as foreign commerce.

187.     Apple's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

188.     As an app developer, Plaintiffs have been harmed by Apple's anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered and continue to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending Apple's anti-competitive conduct issues.

189.     To prevent these ongoing harms, the Court should enjoin the anti- competitive conduct complained of herein.

## COUNT IV
## SHERMAN ACT §2

190.      Plaintiffs repeat and re-alleges each and every allegation contained herein as if fully stated under this count.

191.     Apple's conduct violates Section 2 of the Sherman Act, which prohibits "monopolization of any part of the trade of commerce among the several States, or with foreign nations. 15 U.S.C. Section 2

192.     The iOS App Store is an antitrust market as defined above. Alternatively, the market exists for smartphone enhanced commerce and information transactions over the national internet backbone.

193.     Apple unlawfully maintains its monopoly power in the iOS App Store through its unlawful denial of access to Plaintiff's apps through disallowment and/or app ranking suppression.

194.     Apple serves as a *de facto* access point to the national internet backbone, for consumers who have invested trillions in their smartphone hardware and tax money for the backbone itself. Apple's anticompetitive behavior prevents consumers and taxpayers from fully realizing the benefit of their investment though apps such Plaintiff's and Class members. Apple likewise prevents developers from transacting with and innovating for these consumers.

195.     Apple could exert quality control and law enforcement via its App Store, without infringing upon the rights of the consumers, and the developers who serve them. Specifically, Apple could create an independent App Court that ensures due process. This App Court would act independently from Apple Management, and would reduce or eliminate the problem of favoritism and cronyism, or self-preference of Apple's rival apps. Developers who have a grievance about excessive commissions harming their product, unreasonable disallowment, and other issues could be afforded due process through said App Court.

196.     Indeed, such an App Court would be a vast improvement over the corrupt, self-serving App Store management currently in place. Per US House findings, even Apple staff finds Apple's behavior breathtaking. Such is the experience of Plaintiffs, in their dealings with junior app store workers.

197.     Counsel proposed said App Court to Apple in April 2021. As explained to Apple, an Independent App Court would be the first law enforcement venue solely dedicated to application computer code.

198.     Disallowing Plaintiff from offering his edutainment blockchain app is not a reasonable right Apple has, particularly when it is part of a wider curation of a large group of startups that compete with Apple Arcade. There existed no valid reason for Apple to block the Plaintiff's application, let alone thousands of startups, from contributing to the public good.

199.     Not only does Apple prevent rival developers from selling their product to Apple customers through the App Store they control; Apple produced Apple Arcade simultaneously with Plaintiff's disallowment. The control of a marketplace, and suspicious timing, where Apple even competes calls for increased scrutiny to this alleged violation of the Sherman Act.

200.     The public and the taxpayer would have benefitted from the increased competition of blockchain educational tools. Frankly, a vast percentage of the public has great curiosity about how blockchain consensus encryption functions, this situation could have been different had Plaintiff's app been rightfully distributed.

201.     Apple disallows applications in an arbitrary and capricious manner to benefit their own monopoly and their business and contract partners.

### COUNT V
### SHERMAN ACT §1 – UNREASONABLE RESTRAINT OF TRADE

202.      Plaintiffs repeat and re-allege each and every allegation contained herein as if fully stated under this count.

203.     Apple's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

204.     The Apple Developer Program License Agreement and the terms of the App Store unreasonably restrain competition between Apple users of different states attempting to access the national and global internet backbone, and the developers that make that a possibility.

205.     The DPLA is an illegal contract as per Sherman Act, which unreasonably dictates to all computer programmers how they must transact business. The Plaintiff, and some class members, refused to sign the DPLA and contracted through third-parties to attempt to access the App Store.

206.     Apple has induced and coerced developers, like many class members, to sign and be bound by their illicit contracts. The contracts waive rights to access the iOS userbase, and allow Apple "carte blanche" to restrict or deny any app, deny rights under First Amendment to speak to the press, dictate how a developer must manage its IP assignments, favor competitors and cronies, and/or overcharge, or underpay. In short, Apple's DPLA and related documents are parasitic contracts that must be restrained by the Court; here, Plaintiff never signed the contract, so is able to proceed with a lawsuit, speak to the press, assign IP, etc, but many class members are not so fortunate.

207.     Apple's conduct and unlawful contractual restraints affects a substantial proportion of the population, approximately 60-80% of internet commerce and information exchange.

208.     Apple's conduct and ability to arbitrarily determine which applications will or will not be published has substantial anti-competitive effects, including here an outright bar

disallowing any blockchain mining, staking, and giveaway edutainment, because of Apple's illegal contracts.

209.     Competition amongst startups, such as others represented by counsel in the proposed MDL, may have indeed saved lives, better informed the public, and other intangible benefits.

210.     Under Apple's forced contracts and policies, countless independent developers have been injured in the same way described in this lawsuit. Apple frequently uses pretextual excuses like protecting consumers privacy rights, or from financial risk, to cherry pick the apps they want, that benefit themselves, their partners and cronies.

211.     Indeed, these pretextual excuses were falsely stated to Plaintiff , and are well documented in the US House report (Exhibit A) and academic papers (See, Screen Time App controversy).

212.     Ironically, after all of these years Apple forgot it was founded in the garage of two independent inventors, the legendary American entrepreneurs Steve Jobs and Steve Wozniak.  There is no good reason, decades later, for Apple to mandate how every app-centric business must go about its daily business, even barring them from the American fundamental right to speak to the press. Apple, under Mr. Cook's regrettable leadership encouraging the anticompetitive over the innovative, is unabashedly anti-American.  This defies Apple's own means of creation. The public can choose which app authors they wish to use, and it is more than evident that Plaintiff's app, at a time when blockchain curiosity reached a pinnacle, would have been downloaded by millions. Here, Apple unlawfully put its thumb on the scales in favor of Apple Arcade, destroying any chance that Primary Productions had to participate in the open and free information exchange afforded by the

internet. To prevent these harms, this Honorable Court shall permanently enjoin the aforementioned anti-competitive behavior.

### COUNT VI
### (Sherman Act § 1)
### TYING THE APP STORE IN THE iOS DISTRIBUTION MARKET TO THE IAP PROCESSING MARKET

213.     Plaintiffs restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

214.     Apple's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations".15 U.S.C. § 1.

215.     Through its Developer Agreement with app developers and its App Store Review Guidelines, Apple has unlawfully tied its in-app payment processor, In- App Purchase, to the use of its App Store.

216.     Apple has sufficient economic power in the tying market, the iOS App Distribution Market, because the App Store is the sole means by which apps may be distributed to consumers in that market.

217.     Apple is able to unlawfully condition access to the App Store on the developer's use of a second product—In-App Purchase—for in-app sales of in-app content. Through its Developer Agreement and unlawful policies, Apple expressly conditions the use of its App Store on the use of its In-App Purchase to the exclusion of alternative solutions in a *per se* unlawful tying arrangement.

218.     The tying product, Apple's App Store, is distinct from the tied product, Apple's In-App Purchase, because app developers such as Plaintiff have alternative in-app payment processing options and would prefer to choose among them independently of how the

developer's iOS apps are distributed. In other words, app developers are coerced into using In-App Purchase by virtue of wanting to use the App Store. Apple's unlawful tying arrangement thus ties two separate products that are in separate markets and coerces Plaintiffs and other developers to rely on both of Apple's products.

219.     Apple's conduct has foreclosed, and continues to foreclose, competition in the iOS In-App Payment Processing Market affecting a substantial volume of commerce in these markets.

220.     Apple has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Apple's conduct or its purported justifications.

221.     In the alternative only, even if Apple's conduct does not constitute a *per se* illegal tie, an analysis of Apple's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal by coercing developers into using its In-App Purchase product.

222.     Apple's conduct harms Plaintiff and class members which, as a direct result of Apple's anti-competitive conduct, are or would be paying supra-competitive fees on in-app purchases processed through Apple's payment processor and have forgone revenue they would be able to generate if their own in-app payment processor were not unreasonably restricted from the market.

223.     As an app developer that consumes in-app payment processing services and as the developer of a competing in-app payment processing tool, certain Plaintiffs and class members have a direct financial interest in the iOS In-App Payment Processing Market

and, in the alternative, in the iOS Games Payment Processing Market, and has been foreclosed from competing with Apple directly as a result of Apple's unlawful tie.

224.    Plaintiff has been harmed by Apple's anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiff has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending Apple's anti-competitive conduct issues. To prevent these ongoing harms, the Court should enjoin the anti- competitive conduct complained of herein.

225.    Apple has attempted to monopolize the U.S. market for iOS app and IAP distribution services. Alternatively, Apple, as the sole U.S. retailer of iOS apps and IAP digital products, and, upon information and belief, a seller of a significant sum of in-app subscriptions, is an attempted monopsonist in the relevant market. More specifically, Apple has willfully acquired and maintained market power by its patently exclusionary conduct, including its refusal to allow iOS device owners to purchase iOS apps and IAP other than through its own App Store; refusing to allow other app stores to be allowed on its devices; and mandating that iOS developers who sell through the App Store cannot sell their apps though any other means that are meant to reach iOS device consumers. Each of these instances of exclusionary conduct is also directly exclusionary in the U.S. market for iOS app and in-app-product distribution services, or for retailing iOS apps, in-app products, or subscriptions, because they ensure that iOS app developers must use Apple's distribution services to reach iOS device owners.

226.    Apple's anti-competitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market (or sub-market) for iOS app and in-app-product distribution services.

227.     Apple has a specific intent to achieve monopoly power in the U.S. market for iOS app and in-app-product distribution services, or for retailing iOS apps, in-app products, or subscriptions. Now, and if its unlawful restraints are not checked, Apple has a dangerous probably of success.

228.     Apple has the power to exclude competition in the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps & IAP and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

229.     Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for iOS app and in-app- product distribution services, or for retailing iOS apps, in-app products, or subscriptions.

230.     Apple has behaved as alleged herein in an attempt to obtain a monopoly in the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps and IAP with the effect being that competition is foreclosed and that consumer choice is gravely diminished. So is innovation. Additionally, Apple has abused its market power by charging supra-competitive 30% distribution fees and mandating minimum prices and end-in-$.99 pricing for iOS apps and in-app products.

231.     There is no business necessity or other pro-competitive justification for Apple's conduct. Apple's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality, and lowered output and consumer choice.

232.     Plaintiffs and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including by way of overpaying for iOS app and IAP distribution services. Additionally, or alternatively,

plaintiffs and the federal law class have suffered damages because they were underpaid by Apple as a result of the Apple's conduct as described herein.

233.    Plaintiffs and the federal law class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction barring this anti-competitive conduct.

## COUNT VII
## BREACH OF CONTRACT

234.    As an alternative theory, should the court find Plaintiff entered into privity with Apple, which Plaintiff vehemently denies, it is asserted the privity was an illicit monopolistic contract whereby Plaintiff had no real choice as to the terms.

235.    Apple breached the fundamental intent, and the legal portions therein its own Developer Agreement when they refused to allow legal, reasonable app to be published App Store.

236.    This refusal to publish directly caused the damages described in this Complaint. Refusal to publish of the App entailed blocking access to the smartphone enhanced national internet backbone.

237.    A baseline estimate of contractual losses assumes Primary Productions first to market app would have given away hundreds of millions of dollars in free blockchain currency, and a fair profit on that currency.

## COUNT VIII
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

238.    As an alternative theory, should the court find Plaintiff entered into privity with Apple, which Plaintiff vehemently denies, it is asserted the privity was an illicit monopolistic contract whereby Plaintiff had no real choice as to the terms.

239.     In choosing to develop an app for Defendant's Apple iPhone, Plaintiff relied on the covenant of good faith and fair dealing.

240.     In every contract there is an implied covenant of good faith and fair dealing by each party not to do anything which will deprive the other parties of the benefits of the contract, and a breach of this covenant by failure to deal fairly or in good faith gives rise to an action for damages.

241.     Indeed, Apple breached the covenant when, developing its competing Apple Arcade, they banned thousands of developers from competing with popular free or low cost apps.

242.     Apple had been on a mission to expand into countless areas using its monopoly advantage, including here games, but also health care, watches, lost and found tiles, automobiles, glasses, and so forth.

243.     There was no good faith when Apple focused on their own success, and blocked Plaintiff and class members competing apps.

## COUNT IX
## RACKETEER INFLUENCED  CORRUPT ORGANIZATION ACT

244.     Apple's breach of the covenant caused substantial damages to Plaintiff class members.

245.     **18 U.S.C. § 1962(c),** known as RICO, has a broad reach to prosecute civil and criminal activity that occurs within otherwise law-abiding businesses, and which may fall through the cracks of other statutory law such as Sherman.

246.     Plaintiffs hereby reallege and reincorporate all prior portions of this Amended Complaint, and assert that these known facts constitute a RICO cause of action.

247.     Defendants formed an enterprise meant to continually grow the largest corporation
in history, and to improperly squash any developers who questioned their DPLA and other
business tactics (e.g. Plaintiff). An enterprise also was formed to discredit these developers,
and in particular, the Plaintiff and related individuals.

248.     These Defendants include individuals within Apple, Apple itself, and/or its counsel.

249.     Defendants engaged in an open-ended pattern of predicate acts over a multi-year
timespan.

250.     Most notably, Defendants routinely engaged in wire fraud and mail fraud by
assigning junior App Review members to issue false, pretextual reasons for rejection to
small developers. Apple knew of this practice and instructed said junior app reviewers  to
issue these statements by telephone calls whenever possible. Indeed, Apple's written
reasons for rejection often differed substantially from reasons given by telephone.

251.     Apple suppressed competitors in App Store rankings, hiding quality apps from the
general public when it suited Apple's own interests. This represents an additional pattern
of wire fraud predicate act.

252.     Defendants engaged in witness retaliation, as noted in a US Congressional
Subcommittee report (see Statement of Facts).

253.     In this particular case, Primary Productions member "Andrew" engaged in
substantial correspondence with Apple's App Review team and Apple management.

254.     Andrew was misled, lied to, and defrauded by the App Review board and Apple
management, in what amounts to wire fraud under applicable RICO provisions.

255.     In one protracted call with "Erica," Andrew explained how disappointed he was to
work on this app for years, only to be told that it was "illegal gambling." Andrew explained

that must be an error, as other Apps such as "HiQ" offer free giveaways, but aren't considered to violated Apple's gambling rules.

256.     Each time Andrew mentioned these inconsistencies, Erica would become uncomfortable and tell him to "worry about his own app, not others." While this advice is plausible for a Kindergarten student, in the competitive App marketplace, and antitrust legal analysis, such "comparable analysis" Andrew tried to engage in was perfectly reasonable, and in fact, is the correct legal standard to apply here.

257.     Not convinced that he had a fair discussion with Erica and the App Review Board, Andrew reached out to App Store Chair Carson Oliver.

258.     Oliver was provided with detailed business plans and spoke with Andrew by telephone. During that call, he admitted that the App Review team was "wrong" to accuse Primary Productions of "illegal gambling," but stated he would revert back to him about "click baiting" "frivolousness." Oliver never got back to Andrew, despite multiple follow-up emails from Oliver.

259.     This counsel is able to declare that this is a pattern of ongoing fraud perpetuated by Apple against multiple Plaintiff-Developers (or potential class members) they treat not only with disdain, but with dishonesty that constitutes a stream of predicate acts as per RICO.

260.     Indeed, Primary Productions had two apps which suffered from lengthy, detailed wire fraud directed at them by Apple. Other pending claims by this counsel, such as Coronavirus Reporter, detail the same concerns. Indeed, the Congressional Subcommittee approaches this topic and describes the fear developers live in of Apple's "tyranny."

261.     Here, Apple retaliated against a valid patent, which at least until it was incorrectly invalidated by Whitepages, should have been treated as enforceable. In related cases, Apple

sought to name witnesses that had been under FRCP witness protection anonymity, and Apple did not follow customary, appropriate routes to challenge anonymity. These retaliatory actions from a pattern, and were done with intent to harass a witness, a patent holder, a member of the proposed Class, discredit him or her, and or place him or her in fear.

262.    Apple has profited greatly by said racketeering – their own apps have ousted competition from the App Store marketplace, and they block every developer in the world from reasonably free access to the national smartphone enhanced internet backbone, while assessing tens of billions in subscriptions to these aspiring developers.

263.    Plaintiffs request civil damages, injunction, and/or joinder of the United States to prosecute RICO violations by Apple.

WHEREFORE, The Plaintiff and class members respectfully request that this Honorable Court:

A.  Certify this case as a developer class action lawsuit and that it certify the proposed federal law classes on a nationwide basis for all developers who were disallowed or subject to ranking suppression, or subject to excessive 30% rents and $99 annual subscription fees. Allow prompt, expedited discovery to identify those developers who are members of the proposed class and to ascertain the full scope of the proposed class. In estimating the total damages amount for all Plaintiffs and class members, as noted in the US House report, Apple's excess developer fees alone could represent $30 billion over the past ten years, before treble damages. Depending upon the number of plaintiffs, which is hereby sought in expedited discovery, total actual and punitive damages are estimated to approach $200 billion USD at a minimum, making this the largest known class action. This number will be further revised upon discovery.

B.  Award treble damages to Lead Plaintiff under Antitrust Law caused by Defendant Apple's anticompetitive behavior amounting to USD $900 million dollars.

C.  Award damages to the developer class members for lost brand goodwill, lost revenue opportunities, anticompetitive annual subscription fees, and excessive rents.

D.  Issue a permanent injunction under the Sherman Act restraining Defendant's App Store from denying reasonable applications from access to the smartphone enhanced internet backbone; from denying developers due process in the app review process in the form of a newly created, independent, and impartial App Court, from implementing excessive rents through payment processing, and any and all other anticompetitive behavior the jury finds.

E.  Grant any further relief as may be fair and just.

Respectfully submitted, this 2nd day of August 2021.

/s/ Keith Mathews
Keith Mathews
Maine Bar No. 5382
AWP Legal
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

**CERTIFICATE OF SERVICE**

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing was delivered electronically to counsel for the Defendants with counsel, and emailed to those without known counsel.

Executed on this 2$^{nf}$ day of August 2021.


                     /s/ Keith Mathews
                     Keith Mathews
                     Attorney for Plaintiff